358 So.2d 508 (1978)
John STOUTMIRE, alias John J. Stoutmire
v.
STATE.
3 Div. 870.
Court of Criminal Appeals of Alabama.
May 2, 1978.
*509 Tyrone C. Means, of Gray, Seay & Langford, Montgomery, for appellant.
William J. Baxley, Atty. Gen. and Milton E. Belcher, Asst. Atty. Gen., for the State.
BOWEN, Judge.
This is an appeal from an indictment and conviction of assaulting a peace officer with a deadly weapon. Sentence was fixed at two years' imprisonment by the trial judge. The appellant's retained trial counsel was appointed to represent him on this appeal.
The only question presented is whether the state made out a prima facie case. The appellant alleges that the state failed to prove (1) an assault (2) with a deadly weapon.
The state's evidence reveals that on the night of the 11th of September, 1977, officers of the Georgiana Police Department received information as to the whereabouts of the appellant who was being sought on charges of burglary and grand larceny in Butler and Montgomery County.
Inside the residence of Margaret Reese the officers attempted to arrest the appellant. When approached the appellant ran into the bedroom where he turned and pulled a pocket knife on the pursuing officers. Because the conviction must stand or fall on these events, they must be examined in detail.
Officer James Blackmon of the Georgiana Police Department testified that after the appellant was advised of the fact that he was under arrest, he "broke loose and ran". The appellant knocked two officers back and "slung them loose".
"Then, all three of us followed him back to the back room, and he went over to a window and had knocked the screen out, and had the window open. We told him not to go out the window, not to go any further, something in that order, and he started turning around, and as he turned around, he pulled that knife out of his pocket and opened the blade on it. At that time, all three of us drawed our guns on him at that time."
* * * * * *
"A. Well, he was waving it in front of him (indicating) like that, warning us not to come any closer.
"Q. Did he threaten you with the knife?
"A. Well, he was just waving it around telling us and warning us to stay back.
"Q. And, telling you not to come any closer?
"A. That's correct."
"A. Well, when he was waving the knife, we pleaded with him to drop the knife, and several seconds, seems like maybe longer, but we pleaded with him several seconds. He wouldn't do it, and he started easing out the window, backing out."
After the appellant was out the window,
"he run a short distance from us, and when he went outside, I could hear Joe telling how to throw the knife down. He didn't do it, and when I got out there, he had done started easing along a little sidewalk, along in front of the house, and he ran a short distance, then he turned back on us."
And again on cross examination:
". . . all of us followed him into the bedroom."
* * * * * *

*510 "Yes, sir, that's when he turned around and pulled the knife."
* * * * * *
"Oh, we was pretty doggone close to him, maybe five or six or seven or eight feet, something like that."
* * * * * *
"Well, when he run in there, he turned around and he pulled the knife on us, he waived the knife around and warned us not to come any closer."
* * * * * *
"Q. Did he charge you with the knife?
"A. No, sir, not exactly, not inside the house.
"Q. He just tried to hold you back with it?
"A. That's correct."
Once outside the house, the appellant
". . . went a little further to the corner of the building. He went on back towards like he was going towards the back yard, then he turned around, and then he took a few steps forward."
* * * * * *
"A. He didn't say anything on the outside.
"Q. Did he again charge the officers?
"A. Like I said, he turned around and took several steps back towards us, at that time, I was about ten or fifteen feet away from him."
When the appellant turned around in the backyard and turned toward the officers he had the knife in his hand.
Butler County Deputy Sheriff Levoy Blackburn testified to substantially the same facts.
"So, when he started to search him, he broke and run, and he run into me and Grayson, pushed us aside and went to the back bedroom. When we got there, he pulled a knife, as he kind of turned, that's when he pulled it. He said something, but I couldn't understand what he was saying, but he pushed the screen out of the window and went out through the window."
* * * * * *
"Well, when he got outsidewhenever I got around to where James was, he had turnedhe run out there a piece and he turned and started back (with the knife in his hand)."
When the appellant started back Officer Blackmon shot him.
Deputy Blackburn, testified on cross examination that:
"When he got into the back bedroom, he pulled that knife on me."
* * * * * *
"On all of us."
* * * * * *
"Q. Did any of the officers have theirs (pistols) drawn?
"A. Not until after he pulled the knife."
* * * * * *
"Q. What was he trying to do in the bedroom?
"A. Well, when he pulled the knife out, he turned like he was going to come towards us, and that's when I pulled mine.
"Q. Did he come towards you?
"A. No, sir.
"Q. Was he trying to get out the window?
"A. After he turned, we drawed our guns, he backed up to the window and knocked the screen off. Then, he backed out the window."
Butler County Deputy Sheriff Lamar Grayson stated:
"We tried to, you know, to restrain him, and he started hitting at us, trying to get away from us. He ran back into the back bedroom, down the hallway, to a back bedroom. We followed him into a bedroom, and at this time, he pulled out a knife on us. He was right next to a window. Whenever he got into the room, we got in right behind him, and he pulled out a knife on us."
* * * * * *
"Well, he pulled it out of his pocket, he waved it at us, said don't come any closer, *511 something like that. He had it like this (indicating).
"Q. What did you do then?
"A. We tried several times to get him to drop the knife. So, we pulled our guns out at this time and at the time he come out with the knife, we tried several times to get him to drop the knife. When he refused and would not do that, he knocked a screen out of the window and he finally slid out that window, . . . .
"We got out on the outside, and he ran down the side of the building, and I went around to the right side, and he turned, he stopped and turned, then he turned like he was starting to come back at us."
* * * * * *
"Q. When he turned with the knife in his hand to come back toward you, what if anything happened then?"
"A. That's whenever Officer Blackmon shot him."
* * * * * *
"A. He ran over right next to the window of the room, and that's whenever he turned around and reached in his pocket and come out with a knife on us.
"Q. And, he came out with that knife?
"A. He came out with that knife, yes.
"Q. Did he charge you at that point?
"A. He turned and he waved the knife at us, and he said don't come any further, you know, he was mumbling words like that.
"Q. Did you have your guns drawn at that time?
"A. When he pulled his knifeturned around with that knife, that's whenever I drew my gun. I drew my gun at that time, yes.
"Q. And, was he trying to ease toward the window at that time?
"A. He was right in front of the window, you know, right there at the window.
"Q. Then, after that, he jumped out the window?
"A. He pushed the screen outyou know, he raised the window and pushed the screen out and started easing out.
"Q. And, he was running away? He was trying to get away from all this?
"A. Yes, except for whenever he turned at us with the knife, and after he had gotten outside and run down a little ways, he turned around and come back.
"Q. He got outside, he started running away from you, then he turned back around and started back towards you?
"A. I saw that he ran down towards the side of the building, then he turned and took a couple of steps coming back."
This constituted the evidence against the appellant.
In defense, the appellant admitted attempting to escape but denied the use of any knife to secure that end.
On this appeal we are only concerned with the sufficiency of the evidence to support the conviction of assault upon a police officer with a deadly weapon.
The offense condemned by Section 13-1-42, Code of Alabama 1975, assaulting a police officer in the discharge of his duties with a deadly weapon, requires proof of four essential elements: (1) An assault, (2) with a deadly instrument, (3) upon an officer as defined, and (4) while the officer is engaged in the active discharge of his lawful duty. Hopkins v. State, 51 Ala.App. 510, 286 So.2d 920 (1973). The appellant asserts that the state failed to prove the first two of these elements.

I
The legal question of whether a knife is a deadly and dangerous weapon need be pursued no further than the case of Roberts v. State, 49 Ala.App. 729, 275 So.2d 709 (1973), wherein it was held that a "knife four inches long" was a deadly and dangerous weapon. The knife wielded by the appellant had a blade four inches long. Though not all that is dangerous is deadly, Hopkins v. State, 51 Ala.App. 510, 286 So.2d 920 (1973), under Roberts, supra, a knife is both deadly and dangerous.

*512 II
An assault is not defined by present statute in Alabama. Section 13-1-40, Code of Alabama 1975, only proscribes the punishment for simple assault. Though Section 13-1-42 defines assault upon a peace officer with a deadly instrument it does not define assault. However assault has been defined by judicial interpretation.
"An assault is an attempt or offer[1], with force or violence, to do a corporal hurt to another, whether from malice or wantonness, with such circumstances as denote at the time an intention to do it, coupled with a present ability to carry it out." Tarver v. State, 43 Ala. 354 (1869); McGee v. State, 4 Ala.App. 54, 58 So. 1008 (1912).
Every assault and battery includes an assault. Jacobi v. State, 133 Ala. 1, 17, 32 So. 158 (1902); McGee v. State, 4 Ala.App. 54, 57, 58 So. 1008 (1912). To constitute an assault, there must be the commencement of an act which, if not prevented, would produce a battery. State v. Black well, 9 Ala. 79 (1846); Lawson v. State, 30 Ala. 14 (1857). The term assault includes, of necessity, an attempt to do another personal violence. Murdock v. State, 65 Ala. 520, 522 (1880).
An intent to injure is an essential element of the crime of assault. The intent to harm is the essence of an assault. McGee, supra. Assault has been defined as an intentional attempt to strike within striking distance, which fails of its intended effect, either by preventive interference or by misadventure. Lane v. State, 85 Ala. 11, 4 So. 730 (1887); Yates v. State, 22 Ala.App. 105, 113 So. 87 (1927).
"This is the language of some of the authorities; while others are a little more specific, and say there must be an attempt coupled with a present ability to inflict a battery. Clark's Manual, §§ 618, 619, 620, 621, 622; 2 Bish.Cr.Law, 6th ed. §§ 23, 28, 30, 31; State v. Blackwell, 9 Ala. 79; Johnson v. The State, 35 Ala. 363; Meredith v. The State, 60 Ala. 441. The word `attempt' means, `to make an effort, or endeavor, or an attack'. An attempt implies more than an intention formed. Some steps towards consummation must be taken, before the intention becomes an attempt. Attempt to strike in striking distance, or to shoot in shooting distance, includes the intention, present. ability, and some effort or endeavor to carry that intention into execution. An effort to strike, within striking distance, is an assault. An attempt to shoot, within shooting distance, imports that the assailant had in his possession some description of fire-arm, that he made an effort to use it, and the person on whom he attempted to use it was within the distance the fire-arm would effectively project or discharge its ball. Less than this would not be an attempt to shoot in shooting distance." Gray v. State, 63 Ala. 66, at 73, 74 (1879). It has been noted that:
"The attempt or offer is the basic ingredient of every assault. The chief difference between an assault and an attempt is that an assault presupposes a present apparent ability to commit the offense attempted. Lane v. State, 85 Ala. 11, 4 So. 730; People v. Stanton, 106 Cal. 139, 39 P. 525; 40 Yale L.J. 53, at p. 65. In general therefore the legal principles pertaining to attempts are equally applicable to assaults." DeGraaf v. State, 34 Ala.App. 137, 37 So.2d 130 (1948).
Because a criminal assault involves a present attempt to commit a battery, a mere menace or conditional offer of violence does not constitute an assault in this state. Though the defendant need not actually strike at his victim, a mere threat of violence is insufficient.

*513 "An assault is an attempt, or offer, to do another person violence, without actually accomplishing it. A menace is not an assault; neither is a conditional offer of violence. There must be a present intention to strike. On the question, how far the intention must be carried into actual execution, before the assault becomes complete in law, the authorities do not agree. Holding a gun in a threatening position, without any attempt to use it, or intention to do so, unless first assaulted by adversary, is not an assault. Blackwell's Case, 9 Ala. 79. Drawing a pistol, without presenting or cocking it, is not an assault, as was decided in Lawson v. The State, 30 Ala. 14." Johnson v. State, 35 Ala. 363, 365 (1860).
In State v. Blackwell, 9 Ala. 79 (1846), the defendant retreated in an effort to defend himself from a knife wielding attacker. In his retreat, the defendant "seized and presented a gun, then telling Morgan (his attacker) that if he rushed upon him he would kill him, but the defendant did not shoot or attempt to shoot". The court held that although the gun was held in a threatening position, yet if there was neither an attempt to use nor the intention to do so, unless assaulted by his adversary, the defendant could in no manner be said to be guilty of assault.
"An assault is defined by Blackstone, to be an attempt or offer to beat another without beating him (3 Com. 120) and it seems entirely clear, that when there is no attempt to inflict personal violence on another, there can be no assault. It is laid down that an act, which prima facie would indicate an assault, may be explained by words spoken at the time, as when one, during assize time, in a threatening posture half drew his sword from its scabbard, and said, if it were not that it is assize time I would run you through the body.[2] This was held to be no assaultThe words explaining that the party did not mean immediate injury."Blackwell, at 9 Ala. 82.
Thus a gesture that might otherwise seem menacing is not an assault if accompanied by words explaining why no harm is to be inflicted. Bishop, Criminal Law, Vol. 1, p. 26, § 34 (9th ed. 1973); Anderson, Wharton's Criminal Law and Procedure, Vol. 1, pp. 677-678, § 331.
Despite the language of Balkum v. State, 40 Ala. 671 (1867), a conditional offer of violence still does not constitute an assault in Alabama, the criminal intent of the assailant being the essence of the crime and not the mere fact of unlawfully putting one in fear, creating alarm in the mind or causing apprehension of immediate battery. In light of State v. Blackwell, 9 Ala. 79 (1846) and Chapman v. State, 78 Ala. 463, 56 Am.Rep. 42 (1885), Brown v. State, 48 Ala.App. 456, 265 So.2d 898 (1972), affords no clarification of this issue. On "conditional assaults" generally see Perkins, Criminal Law, p. 131.
In this case when the offer of violence was conditioned, that is, when the officers were "warned" to stay away, it is our opinion that the jury was justified in finding that an assault had already been committed. The evidence is sufficient to support a finding that when the appellant turned toward the officers, drew a knife from his pocket and opened the blade, he had commenced an act which, if not prevented, would produce a battery. The testimony is consistent that when the officers first saw the knife they drew their pistols. This action on the part of the law enforcement officers was such "preventive interference" *514 as would prevent the assault from ripening into a battery. Under these circumstances, the fact that the appellant abandoned his purpose and refrained, after encountering resistance, from committing a battery does not change the character of the assault or purge the appellant of the offense. 6A C.J.S. Assault and Battery § 67, p. 437.
"It is difficult in practice, to draw the precise line which separates violence menaced, from violence begun to be executedfor until the execution of it is begun, there can be no assault. We think, however, that where an unequivocal purpose of violence is accompanied by any act, which, if not stoppedor divertedwill be followed by personal injurythe execution of the purpose is then begun the battery is attempted." State v. Davis, 23 N.C. 125, 127 (1840).
The second act of the appellant in turning toward the officers with the knife in his hand after running some distance from them in the backyard does not constitute an assault because there was no evidence to support even an inference that he had a present ability to carry out any unlawful attemptthat he was in striking distance. Burton v. State, 8 Ala.App. 295, 62 So. 394 (1913); DeGraaf v. State, 34 Ala.App. 137, 37 So.2d 130 (1948).
We have carefully reviewed the record in this case and find no error. The judgment of the trial court is therefore affirmed.
AFFIRMED.
HARRIS, P. J., and DeCARLO and BOOKOUT, JJ., concur.
TYSON, J., concurs specially.
TYSON, Judge, concurring specially.
I concur in the opinion as prepared by my brother, Judge BOWEN, in this case.
With reference to Brown v. State, 48 Ala.App. 456, 265 So.2d 898, this Court dealt with an assault with intent to rob. In Brown, supra, we quoted with approval the definition of "assault" from the opinion of the Supreme Court of Alabama in Johnson v. State, 35 Ala. 363; and this Court in Flournoy v. State, 40 Ala.App. 629, 120 So.2d 121. We pointed out that "a mere menace, standing alone, is not a sufficient basis for the finding of an assault." This Court held that, under the facts of Brown, there were sufficient gestures and threats to constitute a legal assault sufficient to sustain a conviction for assault with intent to rob.
We also quoted with approval from Lyles v. State, 10 Md.App. 265, 269 A.2d 178, as to certain language used by the Maryland Court of Appeals in Williams v. State, 4 Md.App. 643, 244 A.2d 619.
The two Maryland cases above cited were not intended to create confusion as to what the Supreme Court of Alabama had indicated in the early case of Chapman v. State, 78 Ala. 463, 56 Am.Rep. 42 (1885).
I do not read the two Maryland cases as being in conflict with the language of Chapman, supra, but simply attempting to illustrate that a present intent to commit an assault, coupled with overt actions or language, may be sufficient under the facts of a given case to place a party in fear or create alarm, which may also be considered on the issue of an assault under the facts presented.
NOTES
[1] The word "offer" means "effort" and serves as a synonym for "attempt".

"In fact, a real strain is placed upon the word `offer' when it is given the meaning of a mere pretense of impending harm, and the assumption that the word has this meaning when used in the definition of criminal assault is merely part of the explanation of how the tort theory was inadvertently added to the offense." Perkins, Criminal Law, p. 118 (2nd ed.1969).
[2] This example is not a conditional offer of violence but an explanation for the lack of violence. Perkins, Criminal Law, p. 131.

"A conditional threat is to be distinguished from a mere expression by one of a wish to strike another, accompanied with a statement that he will not do so for some stated reason, which does not amount to an assault. This is illustrated by the old familiar cases in of which the assailant, laying his hands upon his sword, said, `If it were not assize time. I would not take such language from you,' and in the other of which the defendant raised his whip and said, `Were you not an old man I would knock you down'."
6 Am.Jur.2d 32, Assault and Battery § 30 (footnotes omitted).